SCOTT, Admr., Plaintiff-Appellee, v. MARSHALL, Defendant-Appellant.

Ohio Appeals, First District, Clermont County.

No. 200. Decided May 5, 1951.

342

John R. Gehrig, Nichols, Speidel & Nichols, Cincinnati, for plaintiff-appellee.

Ely, White & Davidson, Batavia, for defendant-appellant.

## OPINION

Per CURIAM:

This law appeal is from a judgment entered on the verdict of a jury for the plaintiff in a wrongful death action, wherein plaintiff's decedent, a little girl nine years of age, rode her bicycle out of the driveway of her home onto State Route 131 in Clermont County, directly in the path of an automobile being driven by defendant, and in the ensuing collision received the injuries resulting in her death a matter of hours thereafter.

One of the errors assigned is that the court charged on the assured clear distance, when it is claimed the evidence clearly excluded application of that rule from the case.

Starkly stated, the facts, accepting plaintiff's version, show this to be a case where the little girl rode her bicycle out of the driveway from behind a bush, planted in the right angle created by the driveway and the highway, while looking backward over her shoulder, onto the highway at the point of impact shown to be by plaintiff's plat at a point directly in the center line of the driveway, about one foot to eighteen inches onto the traveled portion of the highway, and directly in defendant's right hand lane of travel, in which he was proceeding at a speed prima facie lawful.

It is therefore apparent that the decedent's sudden entrance into such lane of travel cut down the defendant's assured clear distance ahead and there was no evidence tending to show that plaintiff's decedent was within such lane of travel a sufficient time or a sufficient distance ahead to make it possible for defendant to avoid the collision.

On the authority of **Erdman v. Mestrovich, 155 Oh St, 85,** published in Ohio Bar of 3/19/51, subsequent to oral argument of this case, it appears from the state of the evidence here, it was error to give the charge predicated on the assured clear distance ahead rule, requiring a reversal of this judgment on that ground. See, also: **Smiley v. Arrow Spring Bed Co., 138 Oh St 81, 33 N. E. (21) 3, 133 A. L. R. 960.**

Error is also assigned to the refusal of the trial court to charge on the question of contributory negligence, at the request of the defendant. Plaintiff's special charge No. 6 had to do with the degree of care required of a child such as plaintiff's decedent.

The request for this charge by the plaintiff would seem to recognize on the part of the plaintiff the propriety of a charge on contributory negligence of a child such as plaintiff's decedent.

The answer denies any negligence at all on the part of the defendant, but no issue of contributory negligence is made by the pleadings. Nevertheless, it is well settled that where the question of contributory negligence arises from the evidence, it is the duty of the court to charge thereon. **29 O. Jur., Section 234, at page 785.**

As to contributory negligence of children, it is stated in **29 O. Jur., Section 203, page 739:**

"In considering the contributory negligence of children upon the trial of a negligence action, two questions are involved. There is first the question whether the child is capable of contributory negligence. As shown above, a child may be of such tender years as to be incapable of contributory negligence. The question whether the child is capable of contributory negligence is ordinarily a question for the jury."

\* \* \*

"When a child is of such years that its ability or inability to exercise care for its safety admits of no doubt, the court will decide that question as a matter of law."

Such, this case appears to be.

"It is the duty of a jury, in determining whether or not an infant was guilty of contributory negligence, to first determine the standard of conduct to which the child is to be held, by giving due consideration to its age, mental and physical development, and environment, and then, having fixed this standard, to measure that which the child has actually done by this standard, and determine whether or not the child has come up to it, or has failed."

This Court said in **Misrach v. Epperson, 32 Oh Ap, 451,** at **page 458:**

"While it is difficult to see how contributory negligence could be attributable to the defendant in error, a boy eight years of age, still it was unquestionably a question to go to the jury under proper instructions, which were given. The plaintiff in error from her own testimony left the impression that this was a 'dart-out' case, and certainly a proper instruction on contributory negligence was called for, even though not raised by the pleadings."

In 38 Am. Jur., Section 204, at page 884, it is stated:

"Generally speaking, children are required to exercise ordinary care to avoid injuries to themselves."

\* \* \*

"The standard by which to measure the conduct of a child, as regards the question of contributory negligence, is that degree of care ordinarily exercised by children of the same age, capacity, discretion, knowledge and experience, under the same or similar circumstances."

In wrongful death actions, 29 O. Jur., Section 84, page 524, states the rule to be:

"In actions for death wrongfully caused by the negligence of the defendant, the general rule is that the negligence of the decedent proximately contributing to the injury resulting in death bars recovery in favor of the beneficiaries for the loss they have sustained thereby. Contributory negligence of the administrator or executor, in whose name the action for wrongful death is brought, is not a defense, because he is merely a nominal party, and has no interest in the damages to be recovered. However, the personal representative of the deceased is frequently one of the beneficiaries for whom the action is brought, so that the right of action may be affected by his negligence. There can be no doubt that the contributory negligence of the sole beneficiary, or of all the beneficiaries, for whose benefit an action for wrongful death is brought, constitutes a complete defense thereto. The rule now is that contributory negligence is available as a defense against such beneficiaries as by their negligence contributed to the death of the deceased, but not as against those who were not guilty of such negligence.

"The rule in Ohio is that in an action brought by a parent for the loss of the services of his child, by reason of its wrongful or negligent injury by another, the contributory negligence of the parent will defeat his recovery."

In 38 Am. Jur., page 893, the duty of a parent is stated to be:

"They owe the duty to care for their children who are so young and immature that they cannot care for themselves,

and in so doing are bound to exercise such degree of care and prudence to promote their safety, as under all the circumstances, is reasonable and proportionate to the age and intelligence of the children, and to the known dangers, or dangers which might be known by the exercise of due care. The unexplained presence of a child of tender years in a place of danger has been held to indicate negligence on the part of its parents, although such a showing of negligence is ordinarily deemed prima facie rather than conclusive. It is the duty of parents and custodians of children who are non sui juris to use reasonable care to protect them against known hazards incident to their presence on a street or other public way, and to permit or suffer such a child to go or be upon a highway or street unattended may constitute negligence on the part of the parent or custodian, although it does not do so under all circumstances. The question is ordinarily one of fact to be determined in the light of various circumstances, such as the age, capacity, and physical condition of the child, and the amount and character of traffic on the highway or street."

The evidence in the instant case is that both parents were absent from the house at the time of this accident, leaving the decedent without parental surveillance and with access to her bicycle, which she was accustomed to riding out into the highway and beyond the bush forming an obstruction to the view at the entrance thereof, and which was removed shortly after the accident.

It, therefore, appears that a charge on contributory negligence, as applied to the duty of the parents, beneficiaries in this case, should be included.

Having stated the grounds for reversal, noted above, we next consider whether or not there is substantial evidence of any negligence on the part of the defendant requiring this court to remand the case for retrial, or whether it becomes the duty of this court to enter final judgment for the defendant. Decision of this question requires analysis of the pleadings and the evidence.

The specifications of negligence in the amended petition are:

"1. While driving said automobile Frank Marshall failed to keep a proper lookout.

"2. Frank Marshall failed to give warning to plaintiff's decedent of his approach.

"3. Frank Marshall failed to keep said automobile under control, making it impossible for him to stop within the assured clear distance ahead.

"4. Frank Marshall drove at a speed of over forty-five miles an hour, which speed was unreasonable and improper, having due regard for the traffic, surface and width of said highway and for the other conditions then existing.

"5. Frank Marshall failed to operate said automobile with due regard for the safety and rights of others, particularly those of said Phyllis Ann Scott, plaintiff's decedent."

No. 3 has been heretofore disposed of and the court finds no difficulty in eliminating No. 4, for complete failure of proof thereon.

We analyze the evidence with reference to Nos. 1, 2, and 5, although we fail to see circumstances under which any duty to warn (Specification No. 2) is either pleaded or proved.

One Jones, plaintiff's eye witness, from a point on the opposite side of the highway, approximately 200 yards distant, testified on direct examination:

"Q. * * * All right, now, tell the jury what you saw.

A. Well, I heard the sound of a motor and I looked up.

A. to see if it was the Jeep, but it was a LaSalle. I don't know just what model it was. I saw it coming down the road and about that time I saw the bicycle come out about the same time—

A. Then the bumper of the car struck the bicycle; run into the front wheel. The girl seemed to come in and hug the car like as it come on past where it hit her. The fellow driving the car went to the culvert, slowed down, put it in second gear, and proceeded on where I was standing.

Q. What happened?

A. I ran out and hollered at him.

Q. What did you say?

A. I said, 'Do you know what you have done?'

Q. Then what did you do?

A. He proceeded on roughly 100 feet and stopped.

Q. Did you run over to him?

Q. And what did you see in reference to this man?

A. Both hands were on the top of the steering wheel and shaking; a dazed condition.

Q. How about his facial condition?

A. He didn't have any.

Q. Were you talking to him?

A. Yes.

Q. Did he answer you?

A. No, he didn't.

Q. What was he doing?

A. Just looking straight ahead.

Q. What was his expression in reference to his eyes?

A. Well, he was just staring off into space, as far as I know, looking at some object up the road.

Q. Now, you see here on this blackboard that the position in which I have drawn these objects indicates that the front, or front wheel, of the bicycle is in front of the right portion of the bumper, front bumper, of the automobile, and I'll ask you, at the moment of impact, is that a correct representation of what you saw?

A. Yes, Sir.

Q. And I'll ask you further, Mr. Jones, this scene that I have drawn on the right, namely, the moment of impact as you reported took place where with reference to the driveway entrance into State Route 131? Did it take place immediately in front of the driveway?

A. Yes.

Q. And was this point of impact, as I have indicated by placing an 'X' right where the front, where this car touches the front wheel of the bicycle, was that point of impact, or 'X', where was it with reference to the right-hand side, traveled portion of that road? The macadam surface, that is, looking down toward Milford? How far from the traveled portion; from the edge of it?

A. From the edge of the driveway to the road, between a foot or 18 inches.

Q. How much?

A. Between a foot and 18 inches.

Q. It was a foot, or thereabouts. In other words, it was close to the right-hand side of that road, is that right?

A. That's right.

Q. Where was the right-hand side of the car at the point of impact? How far from the right-hand traveled portion of the road?

A. About a foot.

Q. And where was this car being driven with reference to the road? Was it in the middle, on the right-hand side, its right-hand side, on the left-hand side? Whereabouts?

A. He was traveling in the right lane.

Q. And I'll ask you did he, at any point, or did he not swerve out of that line before the time of collision?

A. No.

Q. When was the first time that you observed this car swerving?

A. Right after they hit.

Q. And in which direction did he then swerve?

A. To the opposite side of the road.

Q. And then you say he continued on and didn't slow down until he was near the culvert?

A. He was on the Scott side of the house from the culvert.

Q. Now, let me ask you . . . did he, or did he not stop at that particular point?

A. No.

Q. What did he do?

A. He slowed and looked back over his right shoulder.

Q. You mean he kept sitting in the car?

A. Yeah.

Q. He didn't leave the car at that particular point?

A. No.

Q. Then what happened after he looked over his shoulder?

A. He put it in second gear and went on up the hill and went past me.

Q. Now, you of course say you were at the top of that next hill which, from the drawing on the blackboard, and you say he drove by you when you were standing there?

A. Yes.

Q. What did you do at that point? When he drove right by you?

A. I hollered at him and said, 'Don't you know what you have done?'

Q. And by the time he stopped, where was he?

A. About 100 feet past the driveway I ran out of.

Q. Now, right after he stopped, what did he do then?

A. He—his hands were shaking on the wheel and then he started to back up.

Q. And where did he back up to?

A. He backed up just—well, I couldn't tell you what distance it was, but it was just below where the girl on the bicycle was hit.

Q. Did he, or did he not, get out of the car after he parked it there?

A. Yes, he got out.

Q. What did he do?

A. He sort of walked around. He didn't talk to anybody I saw only he had a dazed expression."

On cross-examination, the witness testified:

"Q. Mr. Jones, as you were looking down the road, you saw the little girl riding a bicycle out the driveway, as I understand it?

A. There's an area there where I could see the house oh, maybe 8 feet, or 10, of the driveway.

Q. Was she eating an orange?

A. No, I drawed that conclusion after I saw her body. The orange had her teeth marks in it.

Q. And you did make the statement she was riding out the driveway eating an orange, is that right?

A. That was what I surmised from seeing the orange right there with her.

Q. Had she lost a shoe as she came down that driveway?

Q. Was she looking back for her shoe as she rode out that driveway?

A. That was only my guess that she was.

Q. And was she looking backward when she rode out onto the highway?

A. At the time I first saw her, she was looking back.

Q. And the car was coming west at about that time and she rode out into the path of the car, is that what you would say?

A. You mean she rode onto the road?

Q. Uh Huh.

A. Yes.

Q. And she struck the car at the right front end?

A. The car struck her.

Q. Did you say that the driver of the car swerved and tried to avoid hitting her but was unable?

A. He swerved after the collision."

On re-direct examination, he testified:

"Q. Now, I'll ask you if at any time from the time you first saw the automobile driven by Marshall until the time this impact occurred, you observed or didn't observe any slackening in speed of that automobile?

A. No. There was no slackening of speed.

Q. When did you first notice variance, in the slackening of speed?

A. After the collision, down near the bottom of the culvert."

And, on re-cross examination, he testified:

"Q. Now, you spoke of an orange that was lying by the little girl. Had she been eating the orange?

A. It had a bite out of it."

The companion eye-witness, Friedrich, testified on direct examination by plaintiff:—

"Q. Now, I want you to tell in your own words, Mr. Friedrich, the jury what you saw that afternoon in reference to that accident. Tell the jury in an audible voice, please.

A. Well, I was cutting on this limb, on this sycamore. I was taking different limbs off which was interfering with the wires and in doing so I was facing towards Mrs. Scott's and I noticed a car coming up the road. I didn't know exact whether it was a car or jeep at the time I noticed it. I was watching to see if it was the Jeep because that's when we quit, and I noticed the little girl was coming out of the driveway and the car hit her and from there I came down out of the tree and ran up the road.

Q. Where did this car go after the moment of impact?

A. It went on up the road past us.

Q. Now, did this car stop?

A. This car did not stop. It was always moving. It slowed down, but then it backed up.

Q. When did it slow down?

A. At about—well, when it hit the culvert it was doing its slowest speed.

Q. Did the driver do anything at that place?

A. He turned around and looked back.

Q. Then what did he do?

A. He picked up speed.

Q. And went where?

A. Up to the edge of Mrs. Simms' property. The edge towards Milford.

Q. You were working, then, with Mr. Clifford Jones?

A. Yes, Sir.

Q. Where was he situated at the accident?

A. At the base of the tree.

Q. What did he do at the time the car went by?

A. He yelled at the man to ask him to stop and ask him if he knew what he had done.

Q. When the car stopped, where was it with reference to the tree you were working in?

A. 100 feet away.

Q. And then what did this car do after it stopped?

A. After he, Whitey, told him what he had done, he put it in reverse and went back toward the scene of the accident.

Q. Now, I have drawn on this blackboard two parallel lines representing State Route 131 and down here I have drawn two intersecting lines representing the culvert, Mr. Friedrich, and up here these lines say they represent Mr. Scott's driveway. Now, I'll ask you if at any moment while you were observing this car coming toward you from the time you saw it whether or not from the time you saw it until the impact occurred, it varied its speed?

A. No.

Q. When did it first change its speed?

A. Right after it had the accident.

Q. I'll ask you, Mr. Friedrich, if at any moment during the time you first observed this car running into your vision and until the moment of impact whether this car did or did not alter its course?

A. It altered its course after it hit the little girl and then it didn't swerve any too much. It went over the center line about 2 foot.

Q. And then what did the car do?

A. It kept on going down the road.

Q. Where did he slow up with reference to the culvert?

A. He slowed right around the culvert.

Q. I'll ask you to describe the scene which you observed at the moment of impact. Where was the bicycle and where was the automobile?

A. Well, the bicycle was extending in the road about a foot, you know, or two; something like that, and the car it was running on the right-hand side about a foot from the edge. Something like that.

Q. And who struck whom?

A. The car struck the bicycle.

Q. Now, what happened after this moment of impact with reference to the bicycle?

A. The front wheel of the bicycle was hit and swung back onto the fender and kicked off to the side.

Q. And where was the bicycle after the impact.

A. Lying on the side of the road.

Q. How far from the driveway?

A. Oh, 20 feet; something like that.

Q. How far from the driveway towards the direction of Milford was the body of the girl lying when you saw her? How far down from the driveway?

A. Roughly, around 10 or 12 foot."

And, on cross-examination, the witness testified:

"Q. Now, you speak of the little girl lying on the highway as 10 or 12 feet from the driveway. Are you referring to the center of the driveway?

A. I am referring to the driveway itself. That's what I said, roughly. I don't know exactly.

Q. You say 10 or 12 feet?

A. Say the edge of the driveway.

Q. You say 10 or 12 feet from the edge of the driveway?

A. Yes.

Q. And the bicycle about 10 feet beyond that?

A. Roughly. Yes. It's on an angle up on the bank.

Q. I did want to inquire of you . . . did you see her eating an orange as she was riding out the drive? Did you see an orange?

A. No, I didn't see any orange.

Q. Had she lost a shoe as she came out of the driveway?

A. Yes, she had lost something. I wouldn't say it was a shoe, because she was looking backwards.

Q. She looked backwards, didn't she?

A. She looked back momentarily. I don't know how long.

Q. It was your opinion that she was looking back momentarily?

A. Yes, it was.

Q. Did you see her shoe lying in the driveway?

A. Yes, we seen it."

This was all the evidence adduced by plaintiff as to how the accident happened. It will be observed that no testimony whatsoever as to speed is included. At this point, from the foregoing, it would seem that reasonable minds could not differ but that the defendant approached the scene of the collision in a lawful manner as to speed and position on the highway.

The testimony places a japonica bush of approximately six feet overall spread in the right angle created by highway and driveway at a distance of 15 to 20 feet from the traveled portion of the highway, which obscured the view of the driver of vehicles in defendant's position to that extent.

There remains the testimony of the defendant to be examined in a light most favorable to the plaintiff.

The defendant testified generally that he was familiar with the road and location of the driveway at the scene of the collision; knew the Scotts lived there with their children; knew that children were apt to be on that road in the afternoon. He further testified as on cross-examination:—

"Q. Now, isn't it a fact, Mr. Tischer, or Mr. Marshall, there was only one little bush 5 feet in diameter, or circular growth, in that place that had been cut down?

A. I said I didn't measure it.

Q. And you mean to tell the jury, Mr. Marshall, that the presence of this little bush 5 feet in size prevented you from seeing anything down this road?

A. That bush most certainly hid the driveway next to the road.

Q. Are you telling us that bush extended from the traveled portion of the road down to 131?

A. It came down to the berm.

Q. Just what do you mean?

A. I mean it hid the driveway, blocked from the direction I were going.

Q. Now Mr. Marshall, with respect to the landscape to the rear of this bush that you talk about in a northerly direction, were there any obstructions between this bush and the end of this driveway?

A. There were not a tree there.

Q. Where was this tree located?

A. Right by that bush.

Q. In reference to the tree, Mr. Marshall, you saw the tree and you know that anything that passed behind this tree could be seen because the bottom branches of this tree were at some distance up from the ground, isn't that right?

A. All I know, I didn't see the girl until she hit the highway.

Q. All right. Now we'll go on from there. Now, where did you first see this girl?

A. I was possibly 15 or 20 foot above the driveway when she run out there.

Q. Where was she when you first saw her?

A. Coming out the drive on her bike. After she passed the bush is when I seen her.

Q. With reference to your automobile, the position of it, at the moment you spotted her, where was she? Was she on State Route 131?

A. She was coming out the drive toward 131 and I swayed square to the left.

Q. Was she still on the highway at the moment you saw her?

A. I wouldn't say she was.

Q. Where would you say she was?

A. She possibly could have had the front wheel on the blacktop.

Q. Please tell us where this girl was with reference to the intersection of the driveway with the state route at the first moment you saw her?

A. I think I made that clear.

Q. How's that?

A. I think I have made that clear.

A. I said she was entering 131 when I seen her.

Q. How far was her bicycle into 131?

A. I don't know.

Q. As a matter of fact, you didn't see her at all until you hit her, did you, Mr. Marshall?

A. I didn't hit her.

Q. You didn't? Tell the jury how this collision occurred?

A. She came out there and hit the side of the car. Anybody can see that.

Q. All right. Where did she hit the car?

A. Right by the front wheel.

Q. Did she run into the side of your car?

A. Run into the fender.

Q. And where were you going meanwhile?

A. I was coming across the road trying to get away from her.

Q. And you swayed violently to the left, is that what you want the jury to believe?

A. That's what I did.

Q. Where did you come to a stop?

A. Right by the mailbox.

Q. * * * Now from the moment you saw this little girl, you tell us you swerved your car to the left, is that right?

A. I did.

Q. Did you apply your brakes?

A. I did.

Q. At what rate of speed were you going at that time?

A. Between 30 and 35, possibly.

Q. Now, in what distance did you stop in, according to your story?

A. I don't know.

Q. Where did you commence to apply your brakes?

A. I said 15 or 20 feet above the drive."

On direct examination, defendant testified:

"Q. Frank, as you approached the Scott residence, I'll ask you if you can tell the ladies and gentlemen of the jury at what speed you were traveling?

A. In between 30 and 35 mile an hour.

Q. And as you approached the residence and drive, I'll ask you whether or not your vision of this driveway was, in any measure, obscured?

A. I couldn't see the drive.

Q. Speak so the jury can hear you.

A. I couldn't see the drive. It was completely hidden at the approach of the road.

Q. And Frank, when did you first see the little girl on the bicycle?

A. Well, I was possibly 15 or 20 feet of the drive when she rode out back of the bush.

Q. And what did you do upon seeing the little girl?

A. I swerved sharp to the left of the road.

Q. And what happened, Frank?

A. Well, I—she just run into me.

Q. In your opinion, did the little girl see you?

A. I doubt if she did.

Q. And where did your car come to a stop?

A. Right above the mailbox."

And, on re-cross-examination, defendant testified:

"Q. Now, you made the statement that the girl ran into you, is that correct?

A. That's right.

Q. You are positive about that?

A. Well, the marks on the car shows it.

Q. Please read the question. Read that last question?

A. I am.

Q. But you don't know just how the accident happened, do you?

A. Well, she came out the drive and hit the car and that's as much as I know about it.

Q. Did you see her at the time of impact?

A. I seen her hit the car.

Q. How did she hit the car?

A. She come out on her bicycle, out the drive, and hit the car; the right front bumper.

Q. Did you see her through the windshield?

A. I did.

Q. Now, you say you are familiar with the Scott driveway; that's correct, isn't it?

A. I have been past there lots of times. Yes.

Q. Let me ask you . . . you also say that this driveway is, in your opinion, or was at that time obscured, is that right?

A. That's right. At the approach of the highway."

In general, we state that whether an automobilist has ■ exercised the ordinary care and prudence exacted of him is a question to be determined by the jury under proper instructions. It is an obligation of the driver of an automobile to watch everything and everybody, not only in front of him but on the sides and in the rear of him in so far as possible. **4 O. Jur. 620.** In **29 O. Jur., p. 420,** the text is:

"In the determination of what constitutes ordinary care, the surrounding facts and circumstances are of controlling significance. The legal duty we owe to others is measured by the exigencies of the occasion. Care must be proportioned to the danger to be avoided. The degree of care to be exercised is determined by the danger to be apprehended. One must use care commensurate with the danger. In other words, speaking generally, what constitutes ordinary care is commensurate with the danger involved."

Again, at page 424, it is stated:

"The general rule is that one who in a sudden emergency acts according to his best judgment, or who, because of want of time in which to form a judgment, omits the act in the most judicious manner, is not chargeable with negligence. ■ An emergency, however, does not change the requirement of ordinary care. A person confronted with a sudden emergency is required to use only that degree of care which an ordinarily prudent person would exercise under the same or similar circumstances."

It is the general rule that negligence is never presumed and that the mere fact of an injury does not give rise to any

inference or presumption of negligence on the part of either party. On the contrary, the presumption is that each party exercised ordinary care and such presumption obtains until overcome by proof, the burden of which rests upon the plaintiff to show by substantial evidence some negligence on the part of defendant directly or proximately causing the injuries.

What is substantial evidence?

Many attempts at definition are contained in Vol. 40 "Words and Phrases" Perm. Ed. page 499, and Pocket Supplements thereto, page 73.

On page 499 appears:

" 'Substantial evidence' on which verdict must be based to preclude Supreme Court from disturbing verdict is evidence which will convince reasonable men, and on which such men may not reasonably differ. Brennan v. Mayo, 50 P. 2d. 245, 248, 100 Mont. 439."

" 'Substantial evidence' on which verdict must be based so as to preclude Supreme Court from disturbing verdict is such as will convince reasonable men who will not reasonably differ as to whether evidence establishes plaintiff's case. Morton v. Mooney, 33 P. 2d 262, 265, 97 Mont. 1."

In the Pocket Supplement appears: (p. 73)

"Evidence presenting no more than a choice of probabilities is not. Gulf Refining Co. v. Mark C. Walker & Son Co., C. C. A. Tenn., 124 F. 2d 420, 426; Troutman v. Mutual Life Ins. Co. of New York, C. C. A. Ky., 125 F. 2d 769, 773."

And on page 75:

" 'Substantial evidence' means more than a mere scintilla, and must do more than create a suspicion of existence of the fact to be established, and means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. U. S. v. U. S. Gypsum Co., D. C. D. C. 67 F. Supp. 397, 451."

" 'Substantial evidence,' within rule that defendant is not entitled to a directed verdict if any charge of actionable negligence is supported by substantial evidence, is more than a mere scintilla and means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Roth v. Swanson, C. C. A. Minn., 145 F. 2d. 262, 265, 266."

There is absolutely no evidence in the record placing the girl on the bicycle within view of the defendant prior to her emerging from behind the bush, at a point not over 20 feet from the point of impact.

There is absolutely no evidence bearing on the time and distance within which an automobile proceeding in lawful

manner at a speed not in excess of 35 miles per hour could or should have been halted.

What evidence is most favorable to plaintiff? That defendant saw the girl the instant she emerged from behind the bush, or that he didn't see her until she was at the edge of the traveled portion of the highway? Doesn't this evidence present a choice of probabilities lacking in substance and requiring pure speculation as to what defendant might or might not have done in such an emergency. Does it amount to substantial evidence that defendant failed to keep a proper lookout, or was driving without due regard to the safety and rights of others, particularly the little girl, who burst into his vision on the bicycle looking backward at a point only 20 feet away from the point of impact?

We do not believe the record contains the substantial evidence of the negligence specified in the petition to require submission of the cause to the jury.

The judgment is, therefore, reversed for the reasons set forth above, with instructions to enter final judgment for the defendant.

HILDEBRANT, PJ, ROSS, J, concur.

MATTHEWS, J, concurs in part & dissents in part in separate memorandum.

MATTHEWS, J, concurring in reversal, but dissenting from entering judgment.

I concur in the reversal of this judgment on the ground that the court erred in refusing the request to charge on the subject of contributory negligence on the part of the decedent and her parents, who would be the beneficiaries of any recovery for causing her death.

I dissent from the conclusion that there is no substantial evidence of negligence on defendant's part. There is evidence that the defendant saw this child when she was 20 feet from the road, approaching his line of travel on a bicycle, looking backward, oblivious of his approach; that he gave no warning and did not change his course until after his right front fender struck the front wheel of her bicycle, notwithstanding he was traveling on extreme right of traveled portion of the road and could have swerved to the left, which he testified he did, but which another witness testified he did not do.

Furthermore, the conduct of the defendant after the collision was such that the jury might have concluded was evi-

# 358

dence of an admission of fault. He continued on after the collision and only stopped when challenged by a witness about 600 feet beyond the point of collision. Flight has always been regarded as some evidence of fault. Kotler v. Lalley, 112 Conn., 86. In 31 C. J. S. p. 1052 (Sec. 291) it is stated that: "Defendant's flight from the scene of an accident is tantamount to an admission of responsibility." This principle has been frequently applied in automobile accident cases. Many such cases are cited in the notes to Section 291 in the original text and more recent cases in the supplement.

It is my judgment that the case should be remanded for a new trial.