**Thomas G. CARULOFF, Plaintiff,**

v.

**EMERSON RADIO & PHONOGRAPH CORPORATION, Defendant and Third Party Plaintiff,**

v.

**STANDARD KOLLSMAN INDUSTRIES, INC., Third Party Defendant.**

**No. 64 Civ. 2130.**

United States District Court,
S. D. New York.

June 23, 1970.

Joseph Kelner, New York City, for plaintiff.

Bernard Helfenstein, Brooklyn, N. Y., for defendant and third party plaintiff; Harold Levy, Irwin M. Strum, New York City, of counsel.

Emile Z. Berman and A. Harold Frost, New York City, for third party defendant; Harold Lee Schwab, New York City, of counsel.

## OPINION

COOPER, District Judge.

On November 26, 1969, following a trial lasting more than two weeks of this diversity action, the jury returned a verdict in favor of plaintiff Caruloff against defendant Emerson Radio & Phonograph Corp. (Emerson) in the amount of $300,000 as damages for injuries suffered by plaintiff when a retainer wire spring on a television tuner he was attempting to service sprang into his eye.

Plaintiff alleged two separate causes of action against Emerson: First, that Emerson was negligent either because the design of the retainer wire spring was unsafe or because Emerson breached its duty to warn of the danger involved in removing the spring. Second, that by virtue of the alleged design defect Emerson breached its implied warranty of fitness of the product. Answering special interrogatories propounded them, the jury found Emerson negligent but found no breach of implied warranty.

During the course of trial the parties agreed to reserve to the Court Emerson's third party claim for indemnity against Standard Kollsman Industries, Inc. (Standard Kollsman). Tr. 244.[1] Subsequent to the jury verdict, Emerson and Standard Kollsman with regard to the claim over stipulated and agreed on January 22, 1970 to rest upon the evidence adduced at the trial of the main action. The opinion which follows constitutes our findings of fact and conclusions of law on this third party suit pursuant to Rule 52, F.R.Civ.P.

### *Facts*

On June 4, 1963, Mr. Caruloff, a precision tool grinder and part-time television repairman residing in Lorain, Ohio,

received a repair service order by telephone from a Mr. Topolav, also of Lorain, who complained that his television set was not working properly in that it had a snowy picture and no sound. Topolav's set was an Emerson television receiver, model 1104 J, manufactured by Emerson in 1955 and sold to him in Ohio in late 1955 or early 1956. Before going to Topolav's home with his repair kit, Caruloff re-read portions of the "Emerson Television Service Note," dated June, 1955 (Plaintiff's exhibit 3–D in evidence). Tr. 187–88, 394–95. It was established at trial to be customary for television servicemen to rely on a manufacturer's service manual, such as this, as their main source of technical information and instructions in servicing its television sets. Tr. 129–35, 635–36, 802.

Arriving at Topolav's home, Caruloff was able to easily correct the audio problem by a tube replacement. Tr. 192. The problem of visual reception remained; so relying on his reading of the service manual and his prior experience he undertook to disassemble a portion of the tuner in order to clean it. Tr. 192–94. To gain access to the contact points in need of cleaning, he attempted to remove the tuner turret. Tr. 194–95. In order to accomplish this he sought to release one of the two 2½ inch retainer wire springs which held the turret firmly in place. Tr. 194–95.

While methods of cleaning the tuner not necessitating removal of the turret, or at least not requiring release of the retainer wire, were suggested by Emerson's witnesses at trial, there was nonetheless ample evidence to support the jury's finding that Caruloff was not contributorily negligent in following this course of action. Indeed, Emerson's own 1955 service manual (which plaintiff consulted) specified with respect to the tuner here in question:

"Repair of tuner part. * * * The majority of tuner troubles which are not due to defective tubes can usually be detected by a physical ex-

---

1. "Tr." followed by a number refers to pages in the trial transcript herein.

amination of the tuner (turret removed), such as burnt resistors, broken parts, bent or dirty contact fingers, cold solder joints, broken socket pins, etc." Emerson Television Service Note, June, 1955, p. 22.

\* \* \* \* \* \*

"Repair of tuner. Most of the small components are readily accessible after the side shield cover is removed. The remaining parts are exposed when the turret is removed. To remove the turret, first take off bottom shield cover, then unhook wire springs on either end and lift out turret." *Id.* at 29. See also, *id.* at 33. Additionally, another serviceman with over twenty years experience testified that he followed this very procedure in cleaning such a tuner. Tr. 643.

On Emerson sets manufactured prior to 1955 the two retainer wire springs were on the outside apron, clearly visible and easy to remove. One end of each wire was looped or hooked in a manner which held the wire in place and also prevented it from flying out upon its release. Caruloff testified that this loop on the end of the retainer wire spring was known among television servicemen as a "safety loop." Tr. 184–85. In 1951 Emerson pictured an exploded view of this design in its booklet "Emerson Television Receiver Notes, Turret-Type Tuner" devoted to the tuner. Plaintiff's exhibit 3 in evidence. Each of the succeeding Emerson manuals through and including the 1955 service manual in discussing the tuner refer to this 1951 booklet. Plaintiff's exhibits 3–A, B, C and D.

In 1955, Emerson employed for the first time a tuner Standard Kollsman had been manufacturing for other customers since 1953 which permitted a combination of both VHF and UHF.[2] Tr. 236, 1035–44. This added feature necessitated a more complex and sophisticated design. Compactness was required to prevent an unduly bulky size. Tr. 1037–38. The UHF section was designed to mount flush with the front apron, and, as a result, the front retainer wire spring was relocated on the inside of the front apron. Tr. 1038, 1044.[3] Having placed the spring on the inside apron of the chassis, the confinement of space prohibited use of the loop. Tr. 1045–47. Therefore, the design of the spring wire was modified so as to eliminate the loop and to captivate both straight ends in pockets formed out of the front apron, which served to prevent the spring from falling out of position —the original purpose of the loop. Tr. 1047.

Yet, no mention of any design change was made and no photograph, drawing or description of this new retainer wire spring was included in the 1955 Emerson service manual. See Plaintiff's exhibit 3–D. Having no warning or instruction, Caruloff was "astonished," upon reaching the point where he was to release the retainer wire in order to remove the turret, to discover that the retainer wire spring was located on the inside of the tuner, in a cramped space within the turret. Tr. 195. This was the first time he had ever worked on a tuner having an inner retainer wire spring.

---

2. Although this combination was permitted by the design, demand for UHF did not develop as expected. Standard Kollsman therefore sold this same design without the UHF portion mounted on top. It was this VHF version which Emerson purchased and whose retainer wire injured plaintiff. See Tr. 1038–44.

3. Since only VHF was actually employed in the tuner purchased by Emerson, there was no continuing design reason

demonstrated for the placement of the spring inside the apron, except the fact that in its original design Standard Kollsman had anticipated the combination of UHF–VHF. In fact a vice-president and former chief engineer for Standard Kollsman testified, that in subsequent years demand for UHF still failed to develop, "so we took the basic design of the chassis, eliminated the possibility of adding the UHF turner, and in the process put the spring on the outside." Tr. 1056.

The outside retainer wire on the earlier Emerson models could be removed by hand.[4] Tr. 156. Here, after he located this retainer wire inside the front apron Caruloff found he could not reach it with his fingers or with long-nosed pliers. Tr. 195. He then took a small screwdriver and, holding a flashlight in his other hand directed at the visible portion of the retainer wire, began applying moderate pressure to try to disengage the spring. Tr. 195–97. With only one-half of the retainer wire visible through the narrow opening, he was unaware that it had no loop to prevent its springing loose. While looking at this wire so that he could direct the pressure he was applying with the screwdriver, the spring was forced loose and flew out into his eye causing blindness.

Emerson and Standard Kollsman argued at trial that Caruloff was negligent in the manner he employed to release the spring; that use of a screwdriver was improper;[5] that knowing he was dealing with a spring, he should have shielded his eyes. These arguments were necessarily rejected by the jury in holding Emerson liable. There was more than adequate evidence to support this finding, especially in light of the employment of loops in the prior design and the complete absence of any mention of any change in the service manual or elsewhere. Tr. 233, 646.

4. The simple operation was performed several times in open court with only fingers supplying the pressure.

5. Use of a screwdriver was certainly not unexpected in light of the testimony at trial. Mr. Edwards, a vice president of Standard Kollsman and formerly chief engineer, stated that in removing the retainer wire he had "used simple screwdrivers to do it." Tr. 1097–99. He did advise use of safety glasses. Tr. 1099. Mr. Fisher, television sales and service shop owner and himself a serviceman for over twenty years, testified that he also used a screwdriver to disengage the retainer wire. Tr. 646.

6. During the period 1953–1955, Standard Kollsman manufactured and sold approxi-

*Indemnity*

Emerson's third party complaint against Standard Kollsman proceeds from the fact that Standard Kollsman designed and manufactured the tuner whose retainer wire spring injured plaintiff. Standard Kollsman delivered the tuner as a single unit to Emerson; Emerson used it as a component part in manufacturing, assembling and producing its television sets.[6]

Emerson alleges two theories, negligence and implied warranty, under which it seeks recovery over from Standard Kollsman for the full amount of its liability to plaintiff.[7]

a. Negligence

With regard to its third party claim of negligence, Emerson is entitled to indemnity from Standard Kollsman only if it is able to prove two essential elements: (1) that its negligence is merely passive, and (2) that Standard Kollsman was actively negligent. See Delta Tank Mfg. Co. v. Weatherhead Co., 150 F.Supp. 525 (N.D.Ohio 1957); American Radiator & Standard Sanitary Corp. v. Titan Valve & Mfg. Co., 246 F. 2d 947 (6th Cir. 1957). See also, 3 Frumer & Friedman, Products Liability § 44.02[3] (1969). We need not resolve whether Emerson has established the latter,[8] since, as we see it, Emerson has failed to show that its own negligence was passive.

mately 5 million of the UHF–VHF tuners with which we are here concerned, including approximately 50,000 to Emerson.

7. Emerson argues that Ohio law governs this third party claim as it did the prime case. Standard Kollsman is content with that position. We are presented with no facts of record to the contrary. In any event, there is nothing to suggest that the applicable law could differ in any respect material to the result we reach.

8. Standard Kollsman argues that it is implicit in the jury's finding of no breach of warranty that the design was not defective and that, accordingly, Standard Kollsman was not negligent at all.

Prior to the sale and delivery of the tuners by Standard Kollsman to Emerson, the former submitted drawings and then pre-production samples of the actual tuner to Emerson for inspection and testing. Tr. 1012–14, 1024, 1075. Only after these were closely examined, including disassembly by Emerson of the sample tuner, and certain modifications (not here relevant) requested by Emerson and agreed to by Standard Kollsman, did Emerson receive these tuners for use in its television sets. Emerson purchased some fifty thousand of these tuners. Tr. 1041. All were checked, but not disassembled, to insure operational performance. Emerson did, however, maintain a factory service shop to repair its sets, including tuners. Accordingly, we believe Emerson knew or should have known of the hazard involved in removing the retainer wire without taking proper precautions.

Mr. DeFalco, Director of Service for Emerson, testified that removal of the retainer wire should not be attempted without safety glasses and a special tool designed to captivate the wire when it is released so as to prevent its springing out. Tr. 790, 796, 798. Other witnesses recommended that at least a rag or handkerchief should be used to block the fii nt of this retainer wire. Tr. 684, 1202–03. Despite these precautions recommended by experts at trial, Emerson's service manuals (relied on by plaintiff), while recommending removal of the turret by releasing the retainer wire spring, contain no word of caution or of explanation as to the safe procedure to be followed. Tr. 834, 970.

Mr. Fisher, a television repairman for over twenty years and owner of a television sales and service store, testified that in his opinion the 1955 Emerson manual did not conform to the standard procedure in such manuals because no description was provided therein of how the spring was held in place. Tr. 674–76, 688. See also, Tr. 921. The need for description was particularly crucial here because the design change eliminating the hook (which Caruloff referred to as a "safety loop") could not be discovered by visual inspection prior to release of the spring. In fact, Fisher stated that on the first occasion he released such a spring (using a screwdriver) it had flown out hitting him in the forehead; thereafter, he used a rag to prevent a recurrence. Tr. 642–46, 684.

In failing to disclose to plaintiff the potential danger involved in removing the retainer wire spring so that he might take proper precautions, Emerson was negligent. Emerson itself prepared its service manuals which were distributed to servicemen such as plaintiff who regarded it as a completely reliable guide—a "bible" as one witness testified. Having undertaken through its service manuals to advise plaintiff on the steps he should follow in the repair and servicing of its product, Emerson was responsible for revealing clearly adequate instruction and information so as to disclose hidden dangers inherent in the very course of conduct plaintiff was advised or may reasonably have been expected to follow. See generally, Jackson v. Baldwin-Lima-Hamilton Corp., 252 F. Supp. 529, 538 (E.D.Pa.1966). See also, 78 A.L.R.2d 594, 606–609 (1961); 3 A. L.R.3d 1016 (1965).

This negligence was not of a mere derivative or passive nature, flowing directly from "misconduct" of Standard Kollsman. It had an independent source in Emerson's disregard of its duty to warn. It is therefore unnecessary to determine whether there existed negligence in product design of a derivative nature, since Emerson's active negligence in failing to fulfill this independent duty bars indemnity. Cf. Massachusetts Bonding & Insurance Co. v. Dingle-Clark Co., 142 Ohio St. 346, 52 N.E.2d 340 (1943).

### b. Breach of Warranty

█ Turning to Emerson's second cause of action in warranty against Standard Kollsman, it must be dismissed as barred by the running of the six year statute of limitations. See Mendel v. Pittsburg Plate Glass Co., 25 N.Y.2d

340, 305 N.Y.S.2d 490, 253 N.E.2d 207 (1969). The claim accrued at the time of the sale of the tuner by Standard Kollsman to Emerson in 1955.[9] *Id.* Emerson's action was commenced in 1966. Accordingly, we need not resolve whether the jury's rejection of plaintiff's claim for breach of implied warranty against Emerson precludes the possibility of such a claim being maintained successfully by Emerson against Standard Kollsman.

For the foregoing reasons, we find that Emerson is not entitled to indemnity from Standard Kollsman.

This shall be considered an order; settlement thereof is unnecessary.

---

9. In contrast, the common law claim for indemnity based on active-passive negligence discussed earlier, does not, however, accrue at the time of the sale and suf-

fers from no limitations bar. See Wolverine Insurance Co. v. Tower Iron Works, Inc., 370 F.2d 700, 702–703 (1st Cir. 1966).