Terri DRAYTON, a Minor, By Her Mother and Next Friend Bernice Drayton, and Bernice Drayton, Plaintiffs,

v.

The JIFFEE CHEMICAL CORPORATION, Defendant.

No. C 72–891.

United States District Court, N. D. Ohio, E. D.

June 19, 1975.

Edward M. Swartz, Swartz & Swartz, Boston, Mass., David A. Katz, Cleveland, Ohio, for plaintiffs.

Thomas P. Mulligan, Richard B. Whitney, Kathleen B. Burke, Jones, Day, Reavis & Pogue, Cleveland, Ohio, for defendant.

## FINDINGS OF FACT AND CONSLUSIONS OF LAW

BATTISTI, Chief Judge.

This action arose out of the severe facial disfigurement incurred by the infant plaintiff, Terri Drayton, as a result of a chemical burn. After a trial to the court, the following facts have been established.

The incident in question occurred on December 21, 1968. At that time both plaintiffs, the infant Terri Drayton and her mother Bernice Drayton, lived in a boarding house in Cleveland, Ohio. The house was occupied by several other tenants including James Henderson, the putative father of Terri Drayton.

At approximately 7:00 p. m. on the night of December 21, 1968 Bernice Drayton and her daughter were on the first floor of the boarding house readying it for Christmas by decorating the Christmas tree and retrieving toys and decorations from the basement. At about that time Henderson returned home [1] and obtained a bottle of "liquid-plumr" from his landlady, Mrs. Sorrell, for the purpose of clearing a clogged drain in the second floor bathroom sink. As he ascended the stairs, Henderson had his daughter, Terri, in one arm and the bottle of liquid-plumr in the other. Hen-

---

1. Mr. Henderson was at a complete loss to explain his whereabouts on the day in question. He testified that he "possibly left that morning" and since it was his day off he "could have done a number of things."

derson testified that as he climbed the stairs he read a portion of the label.

At the top of the stairs, Henderson put Terri on the floor in the hall and entered the bathroom alone. According to the testimony, he then poured half of the bottle of liquid-plumr into the drain and placed the uncapped bottle on the back of the sink adjacent to the left faucet. Henderson then placed a towel over the open drain and stepped back from the sink. At that moment Terri grabbed his leg and screamed. When Henderson looked down at the child, she had been doused with the liquid drain cleaner. Henderson testified that he was unaware of the child's presence in the bathroom until the instant he heard her scream.

Immediately after the accident, Henderson took the child downstairs where both Bernice Drayton and Mrs. Sorrell were present. Recalling that the label said "something about burns" and "something about water" Henderson wet his handkerchief and dabbed at Terri's face. After some confusion, Henderson, Mrs. Drayton, Mrs. Sorrell, and Terri drove to Forest City Hospital so that the child might be treated. Apparently the physicians at Forest City were not equipped to adequately cope with the extensive burns suffered by Terri Drayton. For that reason she was referred to University Hospitals for admission, a transfer that entailed an additional twenty-five minute delay. As a result of the injuries sustained on December 21, 1968, Terri Drayton has been hospitalized on eight separate occasions, undergone eleven operative procedures, and compiled a 190 page hospital record—all at the age of seven.

The product that allegedly caused Terri Drayton's injuries, liquid-plumr, is designed, manufactured, and marketed by defendant Jiffee Chemical Corporation,

an Indiana corporation. At the time of the accident the chemical formulation of liquid-plumr was as follows: 26% sodium hydroxide; 1% or less trisodium phosphate; 1% or less orthosilicate; and 68–72% water. The chemical constitutent sodium hydroxide is more commonly known as lye. Liquid-plumr was designed as an all-purpose drain cleaner for use in both the kitchen and bathroom. It is clear, however, that liquid-plumr is more effective on kitchen drain problems because of its chemical design. The product is essentially an organic decomposer that dissolves grease through a process of saponification. The sodium contained in the solution attacks the grease, rapidly turning it into molten soap. Considerable internal heat is created by the chemical reaction which further speeds the process. The newly formed soap then flows freely down the drain.

Bathroom drain stoppages are generally the result of accumulated hair. Because of the protein composition of hair, liquid-plumr utilizes a shrinkage process rather than one of saponification. As a result liquid-plumr is less effective in cleaning bathroom drains.

In April, 1969, the Jiffee Chemical Corporation, manufacturer of liquid-plumr, was acquired by the Clorox Company. Mr. Summerfelt, who is the Manager of Specialty Products for Clorox, testified that immediately upon acquisition of Jiffee, Clorox embarked upon an intensive program to reformulate liquid-plumr so as to achieve better performance and greater safety. The new formula contains 5% potassium hydroxide which, by its nature, is less caustic than sodium hydroxide. Paradoxically, the new formula, marked by less causticity, has been more effective on grease deposits while being far safer to handle.[2]

2. It should be noted that these subsequent changes in the design and formulation of liquid-plumr are irrelevant to a determination of the reasonableness of defendant's conduct, *Cox v. General Electric Co.*, 302 F.2d 389 (6th Cir. 1962). The reasonableness of such conduct "must be judged in light of the circumstances at the time of manufacture." *Ward v. Hobart Mfg. Co.*, 450 F.2d 1176, 1182 n. 16 and cases cited therein. (5th Cir. 1971).

## I. *Plaintiffs' theories of liability:*

Plaintiffs essentially set forth three separate grounds for recovery: (1) negligence (2) breach of warranty, and (3) strict liability in tort. Negligence is alleged with regard to the design and development of the product iself, its container, the warnings contained on the label, as well as the marketing of an unnecessarily dangerous product. In addition, defendant is charged with breach of express and implied warranties that the product and its container were safe, merchantable, and fit for their intended purposes. Finally, plaintiffs contend that Jiffee marketed a product and container that were dangerous and defective in design, formulation, and labeling making them unreasonably hazardous. Plaintiffs also seek recovery of punitive damages.

## II. *Defendant's contentions:*

Basically, defendant argues that it is free of any negligence in the design, formulation, manufacture, packaging or labeling of liquid-plumr. In addition Jiffee contends that liquid-plumr was not unreasonably dangerous since at the time of the accident there was no known formulation that would have been as effective yet safer for consumer use. It is also asserted by defendant that the proximate cause of Terri Drayton's injuries was the intervening and superseding negligence of James Henderson. Finally, Jiffee denies that it was their product (liquid-plumr) that was being used by Henderson at the time of the accident.

## III. *Alleged Misidentification of the product:*

■■■ With regard to this last contention, it is significant to note that the container which Henderson used to clear the bathroom drain was never recovered nor were the circumstances of its disposal ascertained. Given the emotional atmosphere that surrounded the accident and its aftermath it is most likely that the container was disposed of without regard to what role it might play in pos-

sible future litigation. Thus the identity of the injury-causing product must be determined from the testimony of those who were present in the boarding house at the time of the accident.

The landlady of the boarding house, Mrs. Sorrell, testified that she bought a bottle of liquid-plumr in 1966, more than a year before the incident that is the subject of the instant action. She was quite definite in her testimony as was Mrs. Drayton who said that she remembered the name "liquid-plumr" because "those words were large."

Defendant argues that the injury-producing product was not "liquid-plumr" but rather "Mister Plumber", a drain cleaner composed of 92–93% sulfuric acid. The basis for such argument is certain behavior by Henderson that is arguably inconsistent with the recommended procedures for employing liquid-plumr. Great emphasis is placed on Henderson's covering of the drain with a towel immediately after pouring in the drain cleaner. At a 1972 deposition Henderson testified:

Q. You said, as I understand it, you poured some liquid-plumr into the sink and then put a towel on top of it?

A. Right.

Q. Why did you do that?

A. As I remember reading the label, it said something about odors, you know, giving off a bad odor or something, so I placed a towel over it.

At trial, Henderson's testimony was substantially identical.

The reason for defendant's reliance on Henderson's covering the drain with a towel emanates from the precise wording of the liquid-plumr and Mister Plumber labels. The liquid-plumr label is virtually devoid of any reference to odors. On the front of the label it says merely "No Odor." The Mister Plumber label, however, specifically directs that the drain be covered with a wet cloth. It also states "have plenty of VENTILATION as unpleasant odors may arise.

Covering drain with wet cloth will help." Inasmuch as Henderson testified that he had had no prior experience with drain cleaners such behavior is certainly more consistent with having read the Mister Plumber directions than those contained on the liquid-plumr label. Such an inference, however, is not sufficient to offset the uncontroverted (albeit self-serving) testimony of Henderson, Mrs. Drayton, and Mrs. Sorrell. For such an inference to prevail, this Court would have to find the unequivocal testimony of all three of the above witnesses to be incredible—something which it is not prepared to do.

Similarly, defendant finds great significance in Henderson's *dabbing* Terri's face with a wet handkerchief rather that *flushing* it with water. Resort, again, is had to the exact wording of the respective labels. The liquid-plumr label calls for the affected area to be flushed or flooded with large amounts of water. Mister Plumber, on the other hand, directs that the area be wiped gently prior to being flooded with water. This act by Henderson, which was reasonable and prudent under the circumstances, is too fragile an underpinning upon which to find a misidentification of the injurious product.

At trial defendant also made reference to the rapidity with which the liquid drain cleaner burned Terri Drayton as well as the fact that Mrs. Sorrell's shirt was eaten through as a result of holding Terri Drayton's head to her chest while enroute to the hospital. Mr. Levy, who is president of Krobaugh Laboratories, testified that sulfuric acid acts much more quickly on human tissue than does sodium hydroxide.[3] Similarly, Mr. Summerfelt, the manager of specialty products for Clorox, testified that the effect of the chemical on Mrs. Sorrell's shirt was inconsistent with exposure to a 30% solution of sodium hydroxide and, in fact, was more consistent with exposure to sulfuric acid.

Such empirical observations, however, are of little significance absent a factual frame of reference. To say that sulfuric acid burns human tissue more quickly than does sodium hydroxide is not to say that sodium hydroxide doesn't burn it at all. At trial it was impossible to accurately fix the total elapsed time that the liquid drain cleaner was on Terri Drayton's face. Considering only the twenty-five minute delay in driving from Forest City Hospital to University Hospitals such exposure to the liquid drain cleaner was not insubstantial.

It is also impossible to identify the brand of drain cleaner by its effect on Mrs. Sorrell's shirt. Absent precise information about the shirt's fiber and composition and the duration of the chemical contact any attempt to correlate corrosive effect with a specific chemical compound would be purely speculative. Thus plaintiffs have proven, by a preponderance of the evidence, that it was, in fact, liquid-plumr that came in contact with Terri Drayton and caused her injuries. Having determined that, it then becomes necessary to examine plaintiffs' theories of liability.

IV. *Negligence*

In their amended complaint, plaintiffs aver that:

(a) Defendant negligently designed, developed, formulated, manufactured, tested, inspected, packaged, promoted, advertised, marketed and sold said Liquid Plumr.

(b) Defendant negligently designed, selected, developed, manufactured, filled, capped, promoted, advertised, labeled, marketed and sold the container in which said Liquid Plumr was housed.

3. Mr. Levy's opinion would appear to be contrary to that of Dr. Lucian L. Leape whose article "Accidental Ingestion of Liquid Lye Drain Cleaners," Medical Trial Technique Quarterly, was introduced into evidence at trial. Therein Dr. Leape states "An alkali, like lye, is much more likely to cause esophageal injury than acid, *presumably because of its greater tissue penetrating characteristics,*" at 30–31 (emphasis added).

**1088**

(c) Defendant negligently failed to adequately warn and instruct users of said Liquid Plumr of its dangerous properties, of the safe and proper method of its use, and of the steps to be taken to prevent injury when Liquid Plumr contacted the human body.

(d) Defendant negligently marketed a product which because of its formulation and chemical and physical characteristics was unduly and unnecessarily hazardous considering its intended uses and the necessity of its use.

It is clear that the gravamen of plaintiffs' complaint involves alleged negligence in the design of liquid-plumr itself as well as its container and the warnings placed thereon. There was no evidence adduced at trial that liquid-plumr was negligently manufactured in that it was produced in any way other than that intended. Thus it becomes necessary to ascertain whether defendant Jiffee was negligent in its design and formulation of the drain cleaner marketed as liquid-plumr.

█ Since jurisdiction in the instant action is predicated on diversity of citizenship, this Court is bound to apply the law of Ohio, *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). In a similar situation, the Sixth Circuit Court of Appeals sought to articulate the general rule with regard to negligent design:

"It is conceded that the law of Ohio is applicable to the facts of this case since the accident happened in Ohio. We do not find any cases in Ohio which specifically define the duties of a manufacturer relative to product-design. The general rule may be stated as follows: It is the duty of a manufacturer to use reasonable care under the circumstances to so design his product as to make it not accident or foolproof, but safe for the use for which it is intended. This duty includes a duty to design the product so

that it will fairly meet any emergency of use which can reasonably be anticipated. The manufacturer is not an insurer that his product is, from a design viewpoint, incapable of producing injury." *Gossett v. Chrysler Corp.*, 359 F.2d 84, 87 (6th Cir. 1966).

*See also Dowdell v. United States Industries, Inc.*, 495 F.2d 641, 645 (6th Cir. 1974); *Krentz v. Union Carbide Corp.*, 365 F.2d 113, 119 (6th Cir. 1966); *Shumard v. General Motors Corp.*, 270 F.Supp. 311, 314 (S.D.Ohio 1967).

It is important to note that liquid-plumr is an "inherently dangerous" product since "the danger of injury stems from the nature of the product itself and not to any defect in the product," *Sams v. Englewood Ready-Mix Corp.*, 22 Ohio App.2d 168, 171, 259 N.E. 2d 507, 509 (1969).[4] Such a finding weighs heavily in ascertaining whether the defendant was negligent in the design of its product.

"In determining in any given case whether a defendant exercised that care which an ordinarily and reasonably prudent man would have exercised under the same or similar circumstances, one of the most important of the circumstances is 'the potential danger apparently involved.'" *Thompson v. Ohio Fuel Gas Co.*, 9 Ohio St.2d 116, 119, 224 N.E.2d 131, 135 (1967).

Having thus found incumbent upon defendant a duty to exercise due care in the design of its product and having further found that duty to be more onerous by virtue of the product's inherently dangerous nature, a determination must now be made as to how defendant has discharged that duty.

The testimony of Professor Charles Beroes was particularly enlightening as to the design and chemical properties of liquid-plumr. As an associate professor of chemical engineering at the University of Pittsburgh his qualifications to

4. Defendant admits that its product was inherently dangerous in its own proposed conclusion of law number seventeen.

discuss such matters were beyond dispute.

According to Professor Beroes, the chemical composition of liquid-plumr is such as to enable it to dissolve human tissue in a fraction of a second. The sodium hydroxide contained therein was extremely dangerous since, in solution, the sodium ions were freed to attack the tissue thereby forming yet another chemical compound, essentially that of soap. Of particular concern to Professor Beroes was the reference on the label to proper "antidotes" in case of accidental contact with the skin. In his opinion, a severe sodium hydroxide burn has *no* antidote. The damage incurred is so rapid and so difficult to neutralize that it renders the victim virtually helpless. Contact with the skin results in an immediate chemical reaction which itself generates considerable heat further speeding the saponification of the skin.

On cross examination Professor Beroes testified that he himself has been exposed to very minute amounts of sodium hydroxide while conducting laboratory experiments. In such situations it is his practice to immediately neutralize the chemical with soap and water. When queried as to the deleterious effect of contact with a 26% solution of sodium hydroxide, he stated that no harm would result if the victim were instantaneously prepared to wash the affected area with a great quantity of water. Voluminous amounts of water are required since the saponification process produces a slimy substance that impedes dilution and is difficult to remove. The higher the concentration of sodium hydroxide the more tissue that will be digested. To effectively neutralize the burned area, it must be continuously flooded with copious amounts of water for fifteen to twenty minutes. · In Professor Beroes' opinion, the attempted application of such remedial procedures in a household setting is inevitably too late. His testimony was marked by frequent references to the highly caustic nature of sodium hydroxide which in solutions

of 2% or more is corrosive to human tissue.

The physician and plastic surgeon who treated Terri Drayton intermittently for a period of over seven years, Dr. John DesPrez, also testified at trial as to the nature and extent of sodium hydroxide burns. Dr. DesPrez stated that he had treated another child for burns resulting from contact with liquid-plumr and he described its effect on human tissue as "momentary destruction" with the depth of the burn depending on the degree of chemical concentration. He further testified that had he been present at the scene of Terri Drayton's accident he would have flushed the affected area "fast and furiously" but that in so stating he was drawing upon his knowledge and experience as a physician and undergraduate chemistry major.

Mr. Morton Levy, president of Krobaugh Laboratories, testified on behalf of the defendant seeking to rebut the testimony of Professor Beroes. He stated that the process of saponification initiated by sodium hydroxide contacting human tissue is "not instantaneous" but rather "in the beginning quite slow". He did, however, state that various factors can affect the elapsed time of the chemical reaction.

█ Similarly, Mr. Vernon Summerfelt, the Manager of Specialty Products for Clorox Corporation, testified that exposure to a 30% solution of sodium hydroxide would not result in immediate destruction of human tissue. However, on cross· examination he admitted that he had previously stated that liquid-plumr caused "severe, irreversible damage", and that "first aid was of minimal value." Such statement was apparently precipitated by the impending acquisition of Jiffee by Clorox in 1969 and on cross examination Mr. Summerfelt stated that it was still an accurate summary of his opinion, his direct testimony notwithstanding. The use of such a highly caustic chemical as sodium hydroxide and in such concentration as was present in liquid-plumr constitutes a breach of

defendant's duty to design its product so as to be reasonably safe for the purpose intended.

■ It is also important to note that at no time were tests conducted by Jiffee to determine what effect, if any, liquid-plumr had on human tissue. The only such inquiry was made by Jiffee's attorney who performed the most informal and unscientific of tests. Considerable time and expense, however, were spent on professional testing of liquid-plumr's efficacy and effect on plumbing and sewage systems. Such lack of concern over the consequences of human contact with liquid-plumr constitutes a failure to make reasonable inspection of defendant's product in contravention of its duty owed to the public, *DiVello v. Gardner Machine Co.*, 102 N.E.2d 289, 292 (Com.Pl.Ohio 1951).

■ At trial plaintiffs also sought to prove that liquid-plumr was negligently packaged and labeled. More specifically, plaintiffs allege that the container and cap were negligently designed in that the cylindrical container was possessed of a dangerously high center of gravity thereby making it more easily tipped and that once tipped it would continue to flow in the absence of a safety-type closure. While the liquid-plumr container might be characterized as having unstable geometry and installation of a safety cap might be more desirable, plaintiffs have not shown by a preponderance of the evidence that a reasonably prudent man acting under similar circumstances would have packaged liquid-plumr differently.

■ In a similar fashion, plaintiffs sought to base liability on the alleged inadequacy of the warnings contained on the liquid-plumr label. Much testimony was elicited, particulary from Professor Beroes, as to the advisability of utilizing protective equipment when handling sodium hydroxide. Reference was also made to the alleged inadequacy of the antidotes listed on the label.

"It is the duty of the manufacturer to warn purchasers of the situations and circumstances in which its products may present a danger in the course of intended use." *Shumard v. General Motors Corp.*, 270 F.Supp. 311, 314 (S.D.Ohio 1967).

"Negligence may also arise from a failure of a manufacturer to warn those who use his equipment of a known but latent defect in the equipment rendering the equipment hazardous in certain foreseeable uses. *See Burns v. Pennsylvania Rubber & Supply Co.*, 117 Ohio App. 12, 189 N.E.2d 645; *Caruloff v. Emerson Radio & Phonograph Corp.*, (D.C.N.Y.1970) 314 F.Supp. 631 (applying Ohio law), affirmed (2nd Cir.) 445 F.2d 873; *Sam v. Englewood Ready-Mix Corp.*, 22 Ohio App.2d 168, 259 N.E.2d 507." *Dowdell v. United States Industries, Inc.*, 495 F.2d 641 (6th Cir. 1974).

Plaintiffs' attack goes to the "instructions contained on the liquid-plumr label rather than the "warnings" mandated by law, *see e. g. and compare Boyl v. California Chemical Co.*, 221 F.Supp. 669, 676 n. 6 (D.Or.1963). By stating on the label that liquid-plumr "causes severe burns on contact" along with other indicia of its poisonous and caustic nature, defendants have delineated the circumstances under which their product poses a threat to its users. While it is arguable that the label might be made more informative and therefore make potential purchasers more wary, the law does not require such labeling specificity. For the above reasons, liability cannot be predicated on the design of the liquid-plumr container or the contents of its label.

V. *Proximate Cause*

One of the major sources of contention in the instant action is the proximate cause of Terri Drayton's injuries. Plaintiffs, of course, claim that it is the negligence of defendant while Jiffee argues that it is absolved of liability by the superseding and intervening negligence of James Henderson.

At trial plaintiffs proposed several highly imaginative theories as to how

the bottle of liquid-plumr fell from the sink to the floor and onto Terri Drayton. One theory, to which Professor Beroes adhered, combined the wet, glazed, hard surface of the sink with the waxy material of the container to produce a very low coefficient of friction. Added to this was the bottle's high center of gravity plus the "sloshing" action of the liquid still remaining therein when the bottle was replaced on the sink. The end result of these circumstances, according to Professor Beroes, was a self-induced "tip." Another theory coupled a slight grade in the surface of the sink with the sloshing action to produce an almost imperceptible slide that gradually picked up momentum and presumably carried the bottle over the edge of the sink. Simply stated, these theories are untenable.

Mr. Henderson testified that after placing the half-full bottle of liquid-plumr on the back of the sink there elapsed 10–15 seconds before it fell to the floor. If that is the case the most likely occurrence was that Henderson was startled when Terri grabbed his leg and he accidentally knocked the bottle off the sink. Another possibility is that in attempting to replace the bottle on the sink he either was only partially successful or missed the sink entirely thereby causing the bottle to tumble to the floor. The only remaining question is whether such behavior by Henderson is sufficient to relieve Jiffee of its negligence.

 At the outset it is essential to note that the negligence of Henderson, if any, is not imputed to Terri Drayton so as to defeat her recovery on this claim, *Wasilko v. United States,* 300 F. Supp. 573, 599 (N.D.Ohio 1967), and Terri, as a one year old infant, was herself incapable of being contributorily negligent, *Holbrock v. Hamilton Distributing, Inc.,* 11 Ohio St.2d 185, 228 N.E. 2d 628 (1967). The remaining issue is whether Henderson's actions were of

such a nature as to break the chain of causation emanating from defendant's negligence.

Defendant argues that Henderson's conduct and not theirs was the proximate cause of Terri Drayton's injuries. More specifically, it contends that (a) Mr. Henderson was aware of the dangerous propensities of liquid-plumr; (b) despite such knowledge, he brought Terri into the "zone of danger" and left her unsupervised and (c) Henderson's leaving the bottle uncapped relieves the defendant of any liability.

 With regard to the first part of defendant's argument, that Henderson was fully apprised of the danger inherent in liquid-plumr, it is clear that he was not. He testified that had the label said "for professional use only" or required protective clothing he would not have used it. He further testified that he gave the label only a cursory examination and that the statement of chemical formulation was meaningless to him.

Any attempt to base Henderson's culpability on his bringing Terri to the second floor must also fail. Prior to using the liquid-plumr, Henderson placed Terri in the hall thereby complying with the label's admonition to keep liquid-plumr "away from children." Since Terri at that time was just beginning to walk[5] she might just as well have entered the bathroom from any point on the second floor where she lived. Henderson was not required to preclude any and all possibility of Terri's exposure to liquid-plumr prior to engaging in its use.

 The third point of defendant's argument requires considerably more analysis. Essentially Jiffee argues that Henderson's failure to cap the bottle of liquid-plumr between applications and his inattention to replacing it on the sink constitute superseding and intervening acts of negligence sufficient to relieve the defendant of any liability.

---

5. It is clear from the evidence, and both sides concede, that at the time of the accident Terri was physically incapable of reaching the sink or any object placed thereon.

"The general rule is that when there intervenes between an agency creating a hazard and an injury resulting from such hazard another conscious and responsible agency which could or should have eliminated the hazard, the original agency is relieved from liability. A break in the chain of causation thereby takes place which operates to absolve the original agency from any liability. *Thrash v. U-Drive-It Co.*, 158 Ohio St. 465, 110 N. E.2d 419." *Springsteel v. Jones & Laughlin Steel Corp.*, 2 Ohio App.2d 353, 362, 192 N.E.2d 81, 88 (1963).

There is, however, an important corollary to that rule:

"It is universally agreed that the mere fact that the intervention of a responsible human being can be traced between the defendant's wrongful act and the injury complained of will not absolve him. On the contrary the general rule is that whoever does a wrongful act is answerable for all the consequences that may ensue in the ordinary course of events, though such consequences are immediately and directly brought about by an intervening cause, if such intervening cause was set in motion by the original wrongdoer, or was in reality only a condition on or through which the negligent act operated to produce the injurious results." *Mouse v. Central Savings & Trust Co.*, 120 Ohio St. 599, 605, 167 N.E. 868, 870 (1929).

More precisely, the rule might be restated:

"that whether an intervening act breaks the causal connection between negligence and injury depends upon whether that intervening cause was reasonably foreseeable by the one who was guilty of the negligence. It is not necessary that the defendant should have anticipated the particular injury. It is sufficient that his act is likely to result in an injury to someone. *Mudrich v. Standard Oil Co.*, 153 Ohio St. 31, 90 N.E.2d 859." *Springsteel v. Jones & Laughlin Steel Corp.*, 2 Ohio App.2d 353, 363, 192 N.E.2d 81, 88 (1963).

Thus, the threshold question with regard to the actions of Mr. Henderson is whether "according to human experience and in the natural and ordinary course of events, defendant could reasonably have foreseen that the intervening act was likely to happen." *Taylor v. Webster*, 12 Ohio St.2d 53, 231 N.E.2d 870 (1967). The ineluctable conclusion is in the affirmative.

 The essential intervening acts that defendant relies on are Henderson's leaving the half-full bottle of liquid-plumr uncapped while attempting to replace it on the sink and in the process dropping or knocking it to the floor.

The nature of liquid-plumr is such that its utilization inevitably requires some form of human agency. The bottle must be uncapped and its contents introduced into the drain by the acts of human hands. Under these circumstances, one situation becomes immediately foreseeable—the presence of an open, partially filled bottle of liquid-plumr in a human hand. Since the directions on the bottle call for half of its contents to be used immediately and half to be held in reserve for use, if necessary, human experience would dictate that in the ordinary course of events a consumer might foreseeably place an uncapped bottle on a sink or bathtub ledge. Neither is it unforeseeable that spillage might occur as a result of some inadvertent act by the consumer.[6] This is

---

6. Defendant, in its trial brief, acknowledges the foreseeability of such occurrence:
"it is clear that the likelihood of a container on a ledge being tipped over by an errant hand as well as the possibility that the contents of the container may spill out if and when the cap is left off, are 'dangers' open and obvious to the ordinary user and, therefore, hardly unreasonable." Defendant's Trial Brief at 21.
If the possibility of spillage is "open and obvious" to the consumer, so too must it be obvious to the manufacturer.

precisely the situation that was present immediately prior to Terri's accident. All of these acts by Henderson would have been rendered harmless had liquid-plumr not been negligently formulated so as to include a highly caustic chemical in such high concentration.

The cases cited by defendant in support of their assertion that Henderson's actions absolve it of liability are factually inapposite in that the intervening acts therein were all unforeseeable, *e. g. Self v. American Legion*, 29 Ohio App.2d 189, 279 N.E.2d 889 (1972) (deliberate detonation of unexploded fireworks); *Bennison v. Stillpass Transit Co.*, 5 Ohio St.2d 122, 214 N.E.2d 213 (1966) (attempt to rid tank car of known explosive vapors); *Aetna Ins. Co. v. Loveland Gas & Electric Co.*, 369 F.2d 648 (6th Cir. 1966) (deliberate removal of valve from tank known to be leaking gas); *Michael v. United States*, 338 F.2d 219 (6th Cir. 1964) (speeding automobile with brake failure); *Steagall v. Dot Mfg. Co.*, 223 Tenn. 428, 446 S.W.2d 515 (1969) (open bottle of drain cleaner placed on top shelf of darkened storeroom).

## VI. *Breach of Warranty*

Plaintiffs contend, as an alternate basis of liability, that defendant's use of such a highly caustic concentration of sodium hydroxide in liquid-plumr rendered such product unsafe, unmerchantable, and unfit for the use intended— that of a common, household drain cleaner. Besides breaching such implied warranties of merchantability and fitness for the use intended, plaintiffs also argue that the defendant breached its express warranty, contained in its advertising, that liquid-plumr was "safe" for ordinary household use.

At trial there was introduced into evidence a copy of a letter from The Code Authority, National Association of Broadcasters to Mr. Harold F. Bull, president of the Bull Advertising Agency, which had as one of its accounts the Jiffee Chemical Corporation. The letter requested documentation in support of Jiffee's claim that liquid-plumr is "safe." Also introduced into evidence was Mr. Bull's letter in response wherein he stated that as of March 28, 1967 all references to the word "safe" were being deleted from Jiffee's advertisements for liquid-plumr. Such advertising, however, continued beyond the point in time when Mrs. Sorrell purchased the bottle of liquid-plumr that was used on the night of the accident. Mrs. Sorrell testified that she bought the drain cleaner before Terri was born (1966) and that she had seen the product advertised on television and that it was represented to be "safe" and capable of "fast action." It is clear that Mrs. Sorrell relied, at least in part, on such representations in making her choice of which product to purchase. Under those circumstances Mrs. Sorrell would have a viable cause of action against Jiffee for breach of express warranty:

"Under modern merchandising practices, where the manufacturer of a product in his advertising makes representations as to the quality and merit of his product aimed directly at the ultimate consumer and urges the latter to purchase the product from a retailer, and such ultimate consumer does so in reliance on and pursuant to the inducements of the manufacturer and suffers harm in the use of such product by reason of deleterious ingredients therein, such ultimate consumer may maintain an action for damages immediately against the manufacturer on the basis of express warranty, notwithstanding that there is no direct contractual relationship between them." *Rogers v. Toni Home Permanent Co.*, 167 Ohio St. 244, 147 N.E.2d 612 (1958).

Such cause of action would also be vested in Terri Drayton as "one whose presence at the [scene of the accident] was foreseeable and whose safety it was the duty of the manufacturer to protect by producing a chattel that when used as intended would not endanger the safety of those lawfully at the place of its use." *Lonz-*

rick v. Republic Steel Corp., 1 Ohio App. 2d 374, 205 N.E.2d 92 (1965), aff'd 6 Ohio St.2d 227, 218 N.E.2d 185 (1966).

■ Similarly, by marketing a product that was inherently and unnecessarily dangerous, and therefore not "fit for the ordinary purposes for which such goods are used," defendant has breached its implied warranty of merchantability, O.R.C. § 1302.27(B)(3). Cf. United States Fidelity & Guaranty Co. v. Truck & Concrete Equip. Co., 21 Ohio St.2d 244, 251–52, 257 N.E.2d 380 (1970). Such warranty inures to the benefit of Terri Drayton:

> "A seller's warranty whether express or implied extends to any natural person who is in the family or household of his buyer or who is a guest in his home if it is reasonable to expect that such person may use, consume, or be affected by the goods and who is injured in person by breach of the warranty." O.R.C. § 1302.31.

See also, Lonzrick v. Republic Steel Corp., 1 Ohio App.2d 374, 205 N.E.2d 92 (1965), aff'd. 6 Ohio St.2d 227, 218 N. E.2d 185 (1966). Defendant is therefore liable to plaintiff for breach of warranty.

## VII. Strict liability in tort

Plaintiffs also contend that defendant is liable for Terri Drayton's injuries on a theory of strict liability in tort. Under similar circumstances concerning allegedly defective steel "joists" the Ohio Supreme Court stated:

> "For the plaintiff to recover, he must prove, by the required degree of proof, (1) that the joists were defective, (2) that they were defective at the time the manufacturer sold them, (3) that the defect caused them to collapse while they were being used for their ordinary intended purpose, (4) that the defect was the direct and proximate cause of the plaintiff's injury and (5) that the plaintiff's presence was in a place which the defendant could reasonably anticipate."

Lonzrick v. Republic Steel Corp., 6 Ohio St.2d at 237, 218 N.E.2d at 192 (1966).

See also, Strimbu v. American Chain & Cable Co., 516 F.2d 781 (6th Cir. 1975).

■ Defendants' product has been proven defective in that it was negligently designed to include an unreasonably caustic chemical in unnecessarily high concentration so as to render it inherently and unreasonably dangerous for its intended use. Since this defect in the liquid-plumr was the result of defendant's negligent design it was necessarily present at the time Jiffee sold the product to the public. The defect manifested itself while liquid-plumr was being used for its ordinary intended purpose and such defect was a direct and proximate cause of Terri Drayton's injuries. Finally, Terri's presence in the second floor bathroom of her home could reasonably be anticipated by the defendant. Applying the foregoing facts and discussion, it is clear that plaintiffs have established defendant's liability on a theory of strict liability in tort.

## VIII. Extent of Injury

The injuries sustained by Terri Drayton have had a devastating effect on her physical appearance as well as her mental well being. Dr. DesPrez, who has treated Terri for over seven years, testified that she has undergone eleven separate surgical operations that have left her with extensive and permanent facial scarring. Such scarring and grafting is more conspicuous in Blacks because of congenital skin pigmentation. In remarking on the degree of success attained through surgery, Dr. DesPrez had two salient comments; there would be no future progress because the maturation of scar tissue ceases after approximately two years and additional surgery would be ill-advised since "you can't push children too much more than that." Some future surgical procedures might be in order to loosen scar tissue that has grown taut but they would have to be balanced against the necessary

grafting and resultant scarring and skin discoloration.

Although Terri Drayton possesses normal anatomical functions the effects of her injuries are extremely pronounced. To fully appreciate the catastrophic effect of the liquid-plumr it is essential to understand that much of Terri's face was not only repaired, but actually reconstructed. For example, her eyelids, composed mostly of scar tissue, are so taut that she must sleep with her eyes open. Her left ear has been reconstructed from cartilage extracted from her rib cage.

Mrs. Bernice Drayton, Terri's mother, testified that when Henderson brought Terri downstairs, after the accident, her face had become "melted" and "fused" so that her features were "indistinguishable". There was a "gaping hole" in her face and her forehead was like "bacon."

Mrs. Sorrell testified that immediately after the accident Terri's face became swollen and discolored. Her eyes soon became swollen shut and the affected area of her face and neck took on the appearance of "burnt bacon." Mrs. Sorrell's daughter also testified that when she visited Terri in the hospital early the next morning she "didn't recognize" her. At that time Terri appeared to be in constant pain and her face had swollen to twice its normal size and, in fact, had become so distended that it was impossible to distinguish her features. Terri's eyes remained swollen shut for approximately a week and during that period she was unable to see. Terri's face is presently a mass of grotesque scar tissue, but her physical damage is no less severe than her mental impairment.

Terri's mother testified that the effects of Terri's disfigurement constantly manifest themselves in her everyday life. As a result of her frequent and painful surgery she recoils at the portrayal of doctors and nurses on television. In Mrs. Drayton's opinion Terri is growing "worse" and has no life at all outside her home. She continuously asks her mother "will I ever be pretty again" and "will I ever get married." She can fall asleep only when held in someone's arms and suffers frequent nightmares. She goes to great lengths to avoid contact with anyone outside her immediate family. When someone comes to the house Terri will pretend to be sick or go into the bathroom so as to avoid contact with the outside world. She wears a stocking cap to help hide her scars and lack of hair and sometimes pulls it over her face altogether. When it appears that Terri will have to leave the house she will take off her clothes and hide them in an effort to prolong her stay or prevent her having to leave. Often she must be physically dragged from the house. As a result of her injuries Terri finds terror and fear in the most common of objects; she is afraid of mirrors and understandably refuses to look into them. Mrs. Sorrell's daughter stated that Terri often rubs her face with her hands "as if trying to get the scars away."

Dr. Norman Bernstein, Acting Director of Child Psychiatry at the Massachusetts General Hospital in Boston and Chief of Psychiatry of the Burn Unit at that institution, testified as to the psychological consequences of Terri Drayton's injuries. After interviewing and observing Terri, he found her to be "functioning poorly" and suffering "great emotional constriction." Additionally, she displays a "leper syndrome" and senses the revulsion people feel in her presence.

As a result of her multitudinous hospital stays, Terri lives in fear of every new caretaker that enters her life. In addition, her frequent exposure to anesthesia has left her with an awareness and fear of death that far transcends her years. Dr. Bernstein testified at length as to Terri's anger and frustration and her inability to vent those emotions. He further stated that Terri would grow worse in the future and that her depression might reach such proportions, particularly in her adolescence, that hospi-

talization might be required. In Dr. Bernstein's opinion Terri Drayton is "permanently unemployable." Unfortunately, his description of Terri's plight as "wretched, unceasing personal agony" is tragically eloquent and pitifully accurate.

## IX. *Damages*

At trial, the only expert testimony presented with regard to the question of damages was that of Professor Burke, an economist, who testified on behalf of plaintiff. He stated that Terri Drayton was 1.01 years of age at the time of her accident and had a remaining life expectancy of 70.39. Her work-life expectancy was calculated to be 45 years with such period ending in the year 2027. Professor Burke testified that his economic prognosis was that of a hypothetical person with plaintiff's general characteristics. Embodied in his analysis, however, was the assumption that Terri's hypothetical alter ego was a college graduate. Thus, all of Professor Burke's figures are based on the average income of a college graduate. Incorporated in these calculations is a 5% annual rate of growth in income which Professor Burke characterized as "conservative" since in his estimation the actual growth rate is closer to 6%. Also included is a factor of 14% which Professor Burke felt would compensate for the loss of non-monetary fringe benefits such as pension rights and medical insurance. Assuming all of these factors, in addition to that of Terri Drayton being permanently unemployable, the amount of total lost wages was calculated at $887,000 discounted to present value.

There are several troubling aspects to the premises contained in Professor Burke's final determination of lost wages. The first is the characterization of Terri Drayton as "permanently unemployable." Although Dr. Bernstein testified that the Massachusetts Rehabilitation Board so characterizes disfigured people, such is not necessarily the case. While it is clear that Terri will be de-

nied many employment opportunities as a result of her disfigurement it is not at all clear that she will be precluded from any and all gainful endeavor. Also a source of some difficulty is the assumption that Terri Drayton's future income would parallel that of an average college graduate. The prognostication of future earnings must be based on "reasonable certainty" and not mere possibilities, *Pennsylvania Co. v. Files,* 65 Ohio St. 403, 62 N.E. 1047 (1901). *Johnson v. English,* 5 Ohio App.2d 109, 214 N.E. 2d 254 (1966); *Powell v. Montgomery,* 27 Ohio App.2d 112, 116, 272 N.E.2d 906 (1971). A more realistic appraisal of Terri Drayton's lost future wages, discounted to present value, is $500,000. *See generally Hanna v. Stoll,* 112 Ohio St. 344, 147 N.E. 339 (1925).

The cost of Terri Drayton's future medical care is more easily determined. Dr. Bernstein testified that the average approximate cost for future care would be $8000–$10,000 a year for the rest of Terri's life. Since she has 63 years remaining on her average life expectancy approximately $600,000 would be expended for medical care. *See generally, Tully v. Mahoning Express Co.,* 161 Ohio St. 457, 119 N.E.2d 831 (1954).

In any action involving the award of damages, the objective is to compensate the injured party for his loss and make him, so far as possible, whole. *Pryor v. Webber,* 23 Ohio St.2d 104, 263 N.E.2d 235 (1970). In the instant case, such compensation would include indemnification for pain and suffering, *Oglesby v. City of Cleveland,* Ohio App., 181 N.E.2d 289 (1962). In the case of a disfigured girl there may be subsumed in an award for pain and suffering compensation for the loss or lessening of her prospect for marriage; *Davis v. Zucker,* Ohio App., 106 N.E.2d 169 (1951). It is significant to note that there are here presented injuries of an objective nature from which the trier of fact may draw conclusions as to future pain and suffering without expert testimony as to the degree of permanen-

cy, *Day v. Gullery,* 175 Ohio St. 83, 86, 191 N.E.2d 732 (1963); *Cusamano v. Pepsi-Cola Bottling Co.,* 9 Ohio App.2d 105, 120, 223 N.E.2d 477 (1967). In order to forego the possible traumatic effect of a formal court appearance, Terri Drayton was observed by the Court, in chambers, in the presence of both counsel. The extent and severity of her disfigurement cannot be overstated. Therefore, substantial justice is served by awarding Terri Drayton $500,000 for her past and future pain and suffering.

## X. *Count II of the Complaint*

■ Mrs. Bernice Drayton, Terri's mother, is a named plaintiff in this action seeking compensation for Terri's past and future medical expenses, as well as for the deprivation of the full society and services of her daughter.

> "When a minor child sustains an injury allegedly as the result of negligence of a defendant, two separate and distinct causes of action arise: an action by the minor child for his personal injuries and a derivative action in favor of the parents of the child for the loss of his services and his medical expenses." *Grindell v. Huber,* 28 Ohio St.2d 71, 275 N.E.2d 614.

*See also Weiand v. City of Akron,* 13 Ohio App.2d 73, 233 N.E.2d 880 (1968); *Travelers Indemnity Co. v. Gadfrey,* 12 Ohio Misc. 143, 230 N.E.2d 560 (1967). Thus, "the general rule is that damages for medical and other expenses necessarily incurred for the treatment of the injuries of an unemancipated minor child belong to the parents," *Bagyi v. Miller,* 3 Ohio App.2d 371, 373, 210 N.E.2d 887, 889 (1965). Similarly, "until [a minor child] arrives at maturity or is emancipated, his earnings belong to his parents and cannot be recovered by him," *Sowers v. Birkhead,* 108 Ohio App. 507, 157 N.E.2d 459 (1958). Thus Mrs. Drayton is possessed of a viable cause of action for medical expenses and loss of services that is co-existent with Terri's cause of action for her personal injuries, *cf. Scott v. Marshall,* 90 Ohio App. 347, 105 N.E.2d 281 (1951).

With regard to Mrs. Drayton's claim for damages, it is stipulated that she has already incurred $12,466 in medical expenses for Terri.

■ While it is extremely difficult to quantify the loss of a daughter's services and society, an award to Mrs. Drayton of $100,000 represents just compensation for such loss. Therefore, a total amount of $112,466 is hereby awarded to Mrs. Drayton.

## XI. *Punitive Damages*

Plaintiffs in the instant action seek punitive damages "in order to punish the outrageous conduct of Jiffee Chemical Corporation . . . and in order to deter future conduct of others similarly inclined." (Plaintiffs' Supplemental Memorandum Concerning Punitive Damages at 2). Reference is made to defendant's "false and misleading advertising" which allegedly violated a penal statute that has since been repealed. Plaintiff's argument in support of its claim for punitive damages is more shrill than persuasive.

■ While defendant's conduct in designing and marketing liquid-plumr was negligent and perhaps even reckless, the law requires more before it will countenance the imposition of punitive damages.

> "Thus, ordinarily, proof of only legal malice is not sufficient to justify an award for punitive damages but rather, actual malice must be proved before punitive or exemplary damages may be awarded. Legal malice and actual malice are not synonymous." *Columbus Finance Inc., v. Howard,* 38 Ohio App.2d 7, 311 N.E.2d 32 (1973).

The Supreme Court of Ohio has attempted to set forth the critical distinction between actual and legal malice:

> "Actual or express malice has been defined as that state of mind under which a person's conduct is characterized by hatred or ill will, a spirit of revenge, retaliation, or a determination to vent his feelings upon other persons.

Legal or implied malice, on the other hand, is that which the law infers from or imputes to certain acts, and has been defined as that state of mind under which a person does a wrongful act purposely, without a reasonable or lawful excuse, to the injury of another." *Pickle v. Swinehart,* 170 Ohio St. 441, 443, 166 N.E.2d 227, 229 (1960). *See also, Smithhisler v. Dutter,* 157 Ohio St. 454, 461, 105 N.E.2d 868 (1952).

In the present case it is important to note that the defendant corporation was acquired by the Clorox Corporation shortly after Terri Drayton's accident and Clorox immediately set out to reformulate liquid-plumr so as to render it safe for home use. Its efforts in this regard were in direct contradiction to the egregious conduct of the original Jiffee management. Thus, the "outrageous conduct" for which plaintiffs seek retribution is more properly attributed to Jiffee's original management personnel whose attitudes and marketing policies Clorox, on its own initiative, has successfully purged from the company.

Similarly, the evidence at trial showed that many of the drain cleaners presently on the market are uniformly characterized by safer formulation, crystaline form, and unit packaging thereby avoiding the hazards that contributed to Terri Drayton's accident. Under these circumstances there would seem to be little deterrent value in inflicting punitive damages on the Jiffee Chemical Corporation. As a general rule punitive damages are disfavored in the law absent evidence of willful or wanton conduct by the defendant or the clear need for their imposition as a deterrent, *Marr v. Rife,* 503 F.2d 735 (6th Cir. 1974). *See also, Wood v. Stark Tri-County Bldg. Trades Council,* 473 F.2d 272 (6th Cir. 1973), *cf. Steinberg v. Ogden Foods Inc.,* 501 F.2d 1339 (6th Cir. 1974). Therefore plaintiffs' claim for punitive damages is disallowed.

The above constitutes the Court's findings of fact and conclusions of law in accordance with Rule 52 F.R.Civ.P.

It is so ordered.